Filed 5/11/16  P. v. Glenn CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051087 |
| v. | (Super. Ct. No. FMBMS007714) |
| JAMES ROY GLENN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of San Bernardino County, Lorenzo R. Balderrama, Judge.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, for Plaintiff and Respondent.

\*          \*          \*

**INTRODUCTION**

James Roy Glenn was adjudged a sexually violent predator under the Sexually Violent Predator Act, Welfare and Institutions Code section 6600 et seq. (SVPA),[1] and placed in involuntary commitment for an indeterminate term. At age 88, Glenn filed a petition seeking unconditional discharge pursuant to section 6605 and alternatively for conditional release pursuant to section 6608. In this appeal, Glenn, who is now 90 years old, challenges the trial court's order denying his petition for conditional release. Glenn argues the trial court's decision violates his rights to due process and equal protection, is premised on an incorrect assumption of his county of domicile, and is not supported by substantial evidence. We reject each of these arguments and affirm.

**RELEVANT PROVISIONS OF THE SVPA**

The SVPA provides for involuntary civil commitment of an offender upon release from prison if the offender is found to be a sexually violent predator (SVP). (*People v. Yartz* (2005) 37 Cal.4th 529, 534.) An SVP is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) An SVPA commitment proceeding is a special proceeding of a civil nature. (*People v. Yartz*, *supra*, at p. 536.)

A person found to be an SVP is committed for an indefinite term to the custody of the State Department of State Hospitals (SDSH) for treatment and confinement in a secure facility. (§ 6604.) The SVPA is "'designed to ensure that the committed person does not "remain confined any longer than he suffers from a mental

---

[1] Code references are to the Welfare and Institutions Code unless otherwise cited.

2

abnormality rendering him unable to control his dangerousness.""'" (*People v. Cheek* (2001) 25 Cal.4th 894, 898.)

A person found to be an SVP and committed to the custody of the SDSH must undergo an examination of his or her mental condition at least once a year. (§ 6604.9, subd. (a).) An annual report is prepared based on the examination. (*Ibid.*) The report must include consideration of whether the committed person currently meets the definition of an SVP and whether conditional release under section 6608 or unconditional discharge under section 6605 is "in the best interest of the person and conditions can be imposed that would adequately protect the community." (§ 6604.9, subd. (b).)

If the SDSH determines the committed person no longer meets the definition of an SVP and should be considered for unconditional discharge, then the Director of the SDSH (the Director) authorizes the person to petition the court for unconditional discharge under section 6605. (§ 6604.9, subd. (d).) If the SDSH determines conditional release to a less restrictive alternative is in the committed person's best interest and conditions can be imposed that adequately protect the community, then the Director shall authorize the person to petition the court for conditional release. (*Ibid.*)

Without the Director's authorization, the committed person may not, in the first instance, seek unconditional discharge, but may petition the court for conditional release to a state-operated forensic conditional release program for a one-year period. (§ 6608, subds. (a), (g).) If the petition for conditional release is filed without the Director's concurrence, the court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (§ 6608, subd. (a).)

A hearing on the petition may not be held until the committed person has been under "commitment for confinement and care" for not less than one year. (§ 6608, subd. (f).) Further, a hearing may not be held "until the community program director

3

designated by the [SDSH] submits a report to the court that makes a recommendation as to the appropriateness of placing the person in a state-operated forensic conditional release program." (*Ibid.*)

The court conducts the hearing in order to determine "whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community." (§ 6608, subd. (g).) If the court determines the committed person "would not be a danger to others due to his or her diagnosed mental disorder while under supervision and treatment in the community," then the court orders the committed person placed with an "appropriate forensic conditional release program operated by the state for one year." (*Ibid.*) A "substantial portion" of the conditional release program must include "outpatient supervision and treatment." (*Ibid.*)

After spending at least one year on conditional release, the committed person, with or without the Director's recommendation or concurrence, may petition the court for unconditional discharge. (§ 6608, subd. (m).) In addressing a petition for unconditional discharge, the court determines whether "the person should be unconditionally discharged from commitment on the basis that, by reason of a diagnosed mental disorder, he or she is no longer a danger to the health and safety of others in that it is not likely that he or she will engage in sexually violent criminal behavior." (*Ibid.*)

## FACTS AND PROCEDURAL HISTORY

### I.

### Commitment Under the SVPA

Glenn was born in January 1926. In 2008, at age 82, Glenn was adjudged an SVP under the SVPA and placed in involuntary commitment for an indeterminate term to the custody of the State Department of Mental Health (now called the SDSH; see

4

*People v. Superior Court (Karsai)* (2013) 213 Cal.App.4th 774, 778, fn. 1).  He appealed and filed a petition for writ of habeas corpus challenging the order of commitment.  We issued an opinion affirming the order of commitment.  (*People v. Glenn* (2009) 178 Cal.App.4th 778, review granted Feb. 10, 2010, S178140 (*Glenn I*).)

The California Supreme Court granted Glenn's petition for review and deferred further action in the matter pending consideration and disposition of *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*).  After issuing its opinion in *McKee I*, the California Supreme Court issued an order transferring *Glenn I* back to us with directions to vacate our opinion and to reconsider the cause in light of *McKee I*.  We did so, and in *People v. Glenn* (June 5, 2013, G040608) (nonpub. opn.), we again affirmed the commitment order.  In July 2013, Glenn filed a petition for unconditional discharge under section 6608.  The trial court dismissed the petition without an evidentiary hearing.  We affirmed in *People v. Glenn* (July 30, 2015, G050160) (nonpub. opn.) (*Glenn III*).

## II.

### Petition for Unconditional Discharge
### or Conditional Release

In June 2014, Glenn filed a petition seeking unconditional discharge pursuant to section 6605 and alternatively for conditional release pursuant to section 6608.  An evidentiary hearing on the petition was conducted in October 2014.

A. *Glenn's Prior Criminal Charges*

At the outset of the hearing, the parties stipulated to Glenn's criminal charges, as follows:

—In September 1972, Glenn was charged with pimping, prostitution, pandering, and paying for prostitution.  He was placed on probation for two years.

—In June 1976, Glenn was arrested and charged with furnishing marijuana to a child, lewd and lascivious behavior with a child under 14 years old, and contributing

5

to the delinquency of a minor. He was convicted of contributing to the delinquency of a minor and placed on probation.

—In October 1977, Glenn was accused of two counts of oral copulation in violation of Penal Code section 288a and two counts of committing a lewd or lascivious act on a child in violation of Penal Code section 288, subdivision (a), involving three victims—Patricia (age 9), Richard (age 7), and Shawna (age 5). A report was taken, but Glenn was not prosecuted.

—In August 1986, Glenn was accused of oral copulation in violation of Penal Code section 288a and committing a lewd or lascivious act on a child in violation of Penal Code section 288, subdivision (a), involving two victims—Shannon (age 10) and Robert (age 6.) A report was taken, but Glenn was not prosecuted.

—In July and August 1988, Glenn was charged with two counts of committing a lewd or lascivious act on a child in violation of Penal Code section 288, subdivision (a) against T. (age 11), two counts of committing a lewd or lascivious act on a child in violation of section 288, subdivision (a) against K. (age 8), and an attempted violation of section 288, subdivision (a) against Jason (age 11). There were allegations involving three other boys, but no charges were filed. Glenn was convicted and sentenced to three years in prison.

—In 1988, Glenn was charged with two counts of committing a lewd or lascivious act on a child in violation of Penal Code section 288, subdivision (a) and one count of indecent exposure against Melissa (age 7), one count of indecent exposure against Victoria (age 9), and one count of indecent exposure against Brandy (age 7). Glenn was convicted and sentenced to eight years in prison, consecutive to the three-year sentence.

—While those charges were pending, Glenn's son reported that Glenn had molested his two grandchildren. Reports were taken, but Glenn was not charged.

6

—In 2002, Glenn was charged with eight to 10 incidents of indecent exposure in North Carolina. He pleaded guilty to two charges. He paid a fine, served a short time in county jail, and was placed on probation.

—In 2003, Glenn was arrested in North Carolina for failure to register as a sex offender in California. He was extradited to California. While in prison for this offense, he was evaluated as a potential SVP.

B. *Glenn's Witnesses*

1. *Dr. Mark A. Schwartz*

Dr. Mark A. Schwartz, a licensed psychologist, evaluated Glenn on behalf of the SDSH in 2007 and on Glenn's behalf in 2011 and 2014. In 2007, Schwartz concluded Glenn met the criteria as an SVP. In 2011, Schwartz concluded Glenn no longer met the criteria as an SVP.

After evaluating Glenn in 2014, Schwartz concluded he could be supervised safely "in the community." Schwartz diagnosed Glenn as having a mental disorder now called "pedophilic disorder" under the current version of the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013). Schwartz based his diagnosis on Glenn's extended history of sexual contact with prepubescent children and arousal by them, Glenn having acted out on his sexual urges, and Glenn suffering other personal setbacks, including imprisonment, as a consequence of his actions. In interviews with Schwartz, Glenn denied having had sexual contacts with children, and the only offense he acknowledged was providing marijuana to and contributing to the delinquency of a minor.

In evaluating Glenn, Schwartz started by using the Static-99R test.[2] Schwartz testified the Static-99R database has only four subjects over the age of 80, none

_____

[2] The Static-99 is a sex offender risk assessment tool that must be used to evaluate adult males who are required to register as sex offenders. (Pen. Code, § 290.04, subd. (b)(1).) It is commonly used in SVPA evaluations. (*People v. LaBlanc* (2015) 238 Cal.App.4th

of whom had committed a new sexual offense, and therefore might overpredict Glenn's risk of reoffending.  Schwartz also used the Structured Risk Assessment-Forensic Version Light (SRA-FVL) test, which considers risk factors that can change.  He combined the SRA-FVL score with the Static-99R score in reaching his conclusion that Glenn was not at risk to commit future sex offenses under supervision in the community.

Schwartz had changed his opinion from his original decision in 2005 in large part due to Glenn's age.  When Schwartz first analyzed Glenn, the Static-99 test assigned a score of zero if the subject was over 60, but made no further adjustments for age.  Thus, an 88-year-old man would receive the same adjustment for age as a 61-year-old man, despite the 27-year difference.  Under the Static-99R, the age adjustment has a range of zero to minus three, thereby accounting for older ages.  A score of eight on the Static-99, which would place the subject in a high risk group, could, under the Static-99R, be reduced by up to three points based on the subject's age.  As Schwartz explained, "[t]he prevailing wisdom in the industry is the older you get, the more likely you are to burnout and therefore decrease the number of offenses."  Schwartz reduced Glenn's score from eight to five due to Glenn's advanced age, placing him in the moderate high risk of reoffending.

Schwartz also scored Glenn under the SRA-FVL test, which measures absolute risk, as opposed to the Static-99, which measures relative risk.  Glenn had a score of 1.66 on the SRA-FVL, which placed him in a group with an 11 percent chance of committing a future sexual offense.  Schwartz added that "this is not a super representation of Mr. Glenn's risk because he's older than most of the people in the studies that have done this."

---

1059, 1067, fn. 6.)  The Static-99R, a revised version of the Static-99, takes into account a sexual offender's age based on statistics showing the risk of sexual reoffense decreases with age.  (*Ibid.*)

In reaching the conclusion that Glenn was not at risk to commit future sex offenses under supervision in the community, Schwartz also considered that, while on parole from 1995 to 2002, Glenn had not committed any sexual offenses and that there was no evidence Glenn had engaged in sexual conduct involving children since 1988. Schwartz acknowledged that Glenn had been charged with committing indecent exposure, but found no indication of a sexual component. Schwartz understood that Glenn was a nudist and had been seen on his own property nude on several occasions. There were no reports of children being involved in the acts of indecent exposure. Schwartz testified he could not diagnose Glenn as having exhibitionism, but, even if he could, that would not lead to a sexually violent offense. Schwartz also considered the fact that Glenn had undergone radiation treatment for prostate cancer and that Glenn had told him he was no longer able to maintain an erection or experience physiological arousal.

Schwartz acknowledged instances when Glenn was nude while at the state hospital and had engaged in inappropriate behavior toward hospital staff. For example, he was aware that in January 2011, Glenn had offered to give a female nurse "a show" if he took a shower. That was the only instance of sexual statement or innuendo at the hospital, of which Schwartz was aware, and he did not believe it demonstrated an "ongoing sexual drive."

Glenn generally got along well with the staff and his peers at the state hospital. He sometimes has a temper and occasionally says something profane or walks away from a conversation because he does not like what the staff is asking of him. Schwartz viewed that behavior as relatively insignificant, comparable to sending a schoolchild to the principal's office. The hospital has a system of privileges which are awarded or taken away based upon behavior. The highest level is a four. Glenn consistently receives a three and had not received a four because he is not participating in

9

treatment. There have been times when Glenn's hall pass was pulled for a day or so, but there has never been a serious problem or a police report filed on him.

Schwartz knew that Glenn refused to participate in treatment. Glenn's refusal to participate in treatment might have been a concern 15 years ago because, at that time, the evaluators were trained that refusing to participate in treatment was indicative of an increased likelihood to commit future sex offenses. Subsequent studies have revealed, however, that people who refuse treatment are no more likely to reoffend than those who start treatment. Schwartz could not predict whether Glenn would participate in treatment if required to do so as a condition of his conditional release. While Glenn is capable of understanding what is required of him, he is also "a stubborn old guy."

Glenn's health was another factor which, in Schwartz's view, reduced his risk of reoffending. Not only had Glenn suffered from prostate cancer, he had mobility problems, was at risk of falling, had triglyceride problems, and had a life expectancy of four to five years. Schwartz believed that Glenn had demonstrated he could live longer than four to five years without molesting children.

2. *Kym Caudle*

Kym Caudle is the regional coordinator for Liberty Healthcare Corporation (Liberty), the provider of conditional release treatment for SVP's in California. She had worked for Liberty for 10 years and has the primary responsibility for supervising at least 15 subjects.

When Liberty receives an order for conditional release, it prepares a community safety plan for the subject, develops the terms and conditions of the release, and finds treatment providers who would be willing to work with the subject. Unless ordered otherwise, placements must comply with The Sexual Predator Punishment and Control Act: Jessica's Law (Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006)) and be located in the county of the subject's domicile. The average length of time

necessary to locate a residence for someone placed on conditional release is nine months, but there have been cases where it has taken a couple of years.

The subject must read, initial, and sign the terms and conditions of release, which must be approved by the court. Friends and other potential members of the subject's support system are investigated. Steven Arkowitz is in charge of preparing the treatment plan for release, which is based upon the subject's characteristics and needs. The treatment plan includes both an individual and a group treatment session at least once each week. The decision about how much treatment is required is made in conjunction with community safety teams, which include the treatment providers, Arkowitz, the community program director, and a representative of law enforcement.

Subjects released into the Liberty program are placed on active GPS monitoring. If the subject goes somewhere he is not permitted, Liberty responds immediately and locates him. If Liberty cannot locate the subject, law enforcement is contacted. The subject must prepare a schedule each week and the schedule must be approved in advance.

When the subject is placed on conditional release, a Liberty staff member is made responsible for taking him to appointments, shopping, and wherever he needs to go. At some point, the subject may hire someone for assistance, but that person is subject to a background check. Caudle testified that one person who has been under her supervision for seven years now operates his own car, but can only do so with Liberty's approval. When the subject initially is placed on conditional release, Liberty makes daily contact with him in person or by telephone. The frequency of contact does not decrease until after the first year and only if the community safety team decides it is appropriate.

Once conditional release is scheduled, a process of obtaining public comment commences and a court hearing is conducted at least 45 days after the release order. Law enforcement is made part of the supervision team and is notified of the subject's residence. Law enforcement is not informed of the subject's treatment because

11

that information is protected by the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.). The subject's supervision is shared by "collateral contact[s]," such as friends, an Alcoholics Anonymous sponsor, or church members. Liberty conducts monthly searches of the subject's residence, person, and, if relevant, motor vehicle. During the first three months after release, Liberty conducts surveillance of the subject and arranges for law enforcement to conduct stops of the subject. Liberty, with the assistance of law enforcement, conducts a thorough search of the subject's residence at least twice a year. All subjects, at least initially, are assigned a psychiatrist.

A subject must undergo a minimum of four polygraph tests each year. The purpose of the first test is to compile a complete sexual history. Later tests are used to evaluate compliance with the terms and conditions of release.

Caudle testified there had been instances when subjects under her supervision had violated a term or condition of release. When a minor violation occurs, she might simply talk to the subject, document the violation, and report it to the court. When a significant violation occurs, conditional release might be revoked immediately and the subject returned to the state hospital.

Liberty uses what Caudle described as the "containment model," meaning the subject's behavior is contained and the level of containment is reduced as the subject progresses. Caudle testified that Liberty never had an instance in which a subject has reoffended. Liberty had had nine revocations of conditional release and two situations in which a subject's conditional release had been revoked twice. Conditional release was revoked when it was believed the subject was headed toward reoffending.

On cross-examination, the deputy district attorney asked Caudle to predict the outcome in this situation: An SVP who, while at the state hospital, had refused to participate in treatment and had denied committing any sexual offenses, is placed on conditional release under Liberty's supervision and, while on release, refuses to participate in treatment. She answered: "I would find it likely that we would be

12

returning to court—or, initially, we would be addressing the Court. This is a mental health program. The person would have to engage in treatment."

3. *Dr. Christopher North*

Christopher North, Ph.D., is a psychologist in private practice and serves on the SDSH panel that conducts SVP evaluations. He also conducts similar evaluations for the State of Washington and the federal government. North was hired in December 2013 to evaluate Glenn for his section 6608 petition and interviewed him in January 2014.

North diagnosed Glenn as having pedophilic disorder with sexual attraction to boys and girls. North did not diagnose Glenn as having exhibitionism, despite his indecent exposure convictions, because North viewed the incident in 1988 as being directly connected to the molestation of children and not a separate disorder, and the incidents in North Carolina did not include any evidence of sexual arousal. North testified Glenn has "a long history of being sexually interested in children" that was "part of the sexual makeup, . . . part of his sexual orientation." In North's opinion, Glenn was still sexually attracted to children, but he had not acted on his attraction since 1988.

North conducted a risk assessment of Glenn and concluded he was not likely to reoffend in a sexually violent manner if placed under supervision and treatment in the community. In making this assessment, North reviewed various reports and scored Glenn on the Static-99R, Static-2002R, Structured Risk Assessment-Forensic Version (SRA-FV), and the Hare Psychopathy Checklist-Revised.

According to North, Glenn's scores on the Static-99R and Static-2002R tests placed Glenn in the moderate high risk range. North used the SRA-FV to assign Glenn to a normative group. His score put him between the "routine norms group" and the "refer[red] for treatment" group. North also considered Glenn's age, which North described as "a very significant factor" that "greatly reduces his risk."

North acknowledged that Glenn had denied committing any sexual offenses. North was not concerned because "the research has shown that individuals

13

[who] have denied their sex crimes are at no greater risk than individuals who admit their sex crimes." North believed that Glenn could still benefit from treatment because it could be focused on hypothetical situations and how he should react if he encountered children in public places. North testified that research has shown that people who refuse treatment are not at any greater risk of committing future sex offenses than individuals who enter treatment, and that denial, refusal of treatment, and lack of victim empathy have no correlation to risk of reoffending.

Glenn's score on the Static-99R test placed him in a group with an 11 percent to 16 percent chance of being convicted of a new sex offense within five years of release from custody. Glenn's score on the Static-2002R test placed him in a group with an 8 percent chance of being charged with a new sex offense within five years of release from custody. North did not consider the risk of reoffending over a 10-year period because there was a good chance Glenn would not be alive in 10 years. North concluded the range of 8 percent to 16 percent chance of committing a new sexual offense was an overestimate due to Glenn's age and because Glenn had lived free in society for years without committing a sexually violent offense. Glenn had told North that he had no interest in sex, which was consistent with the records North had reviewed.

North commented that Glenn did "pretty well" at the state hospital. North did not view the occasional instances of inappropriate or verbally abusive expressions of anger as significant but attributed them to a "cantankerous" man's frustration at being where he felt he did not belong. North was concerned about the comment Glenn made to the nurse about giving her a show because it contradicted his claim of having no sexual interest. After reviewing records revealing that Glenn had been quite sick and was just beginning to feel better when he made the comment, North believed it was "hard to know what to make of" the comment. North testified the comment was "anomalous" and "[t]here are no other comments the entire time he's at [the state

14

hospital.]"  Although Glenn sometimes would be nude in his room at the state hospital, that was not a rule violation and he had never been sanctioned for it.

North concluded that if Glenn were conditionally released under Liberty's supervision, he would not present a serious and well-founded risk of reoffending during the remaining years of his life.

4. *Glenn*

Glenn testified on his own behalf.  He acknowledged that he had refused treatment at the state hospital.  He claimed he refused treatment "[b]ecause you have to tell them about your crimes, and I do not have a crime" and testified, "I'll never go to treatment" at the state hospital because "[i]t's never worked."

Nevertheless, Glenn testified he knew he would have to accept treatment if released into a conditional release program and "I will try my very dead level best to do everything they want me to do that I can do."  If placed on conditional release, Glenn testified he would follow all the rules and terms and conditions "because I want to live like a human being so bad."

Glenn denied having a mental disorder.  He claimed he had never committed a crime against children or "touched a child."  He denied that his daughter had accused him of inappropriate sexual conduct in the 1960's and claimed she was his best friend and visited him often.  He offered excuses for his conduct in 1988 that led to criminal charges against him.

When asked how he would avoid being in the presence of children in the future, Glenn testified that he had never sought out children or invited them into the home and that the children he encountered had generally come of their own accord.  He claimed he currently did not have sexual urges and had lost those urges following chemotherapy for colon cancer in 1996.  He had a slight bit of sexual desire, but, he testified, could not get an erection "to save my life."

15

Glenn offered this explanation for his comment to the nurse about giving her a show if he took a shower. During his time at the hospital, he was a loner that did not become close to the staff; however, he hit it off with a "psych tech" named Bridgette. He had been sick with a temperature of 104 to 105 degrees and his comments were the result of his recovery. He was joking around with Bridgette who, he claimed, was a lesbian and twice been placed on leave to deal with drug problems. Bridgette told Glenn she was interested in another woman at the hospital. Glenn made a joke about putting on a show for them to get the other woman interested in Bridgette. Glenn testified he did not know whether he was serious because it was out of his normal behavior and was now ashamed that he made the comment.

Glenn uses a walker because one of his legs is very weak and he suffers from vertigo spells. He fell in a room while waiting to testify.

C. *The People's Witnesses*

1. *Dr. Garrett Essres*

Dr. Garrett Essres, an SDSH psychologist, conducted an evaluation of Glenn in March 2014 to determine whether he met the criteria to qualify as an SVP. Essres based his evaluation on a review of Glenn's records. Using the Static-99R and the SRA-FVL, Essres testified that Glenn's assessment scores put him in the high risk group of people who had a five-year recidivism rate of 25.2 percent. Essres did not use the 10-year category of recidivism due to Glenn's advanced age.

After considering Glenn's "analog behaviors" of sexual deviance at the hospital, Essres concluded that Glenn posed a risk of reoffending. "Analog behaviors" are, Essres testified, "behaviors of sexual deviance that would leak out when somebody has a tight lid on [him] but cannot completely contain them." Essres testified that Glenn engaged in these analog behaviors: "[S]exually inappropriate behaviors, pulling his pants down or attempting to pull his pants down, making suggestive behaviors to nursing staff such, as I'm getting aroused, would you do that examination again, telling

16

nursing staff to watch him when he showered, that he would give them a show, calling an elderly nursing staff woman overly horny for watching him when that was her duty. So there are sexual innuendos, sexual behaviors leaking out at this time. So that's the sexual deviance component."

Essres also testified that Glenn had committed many acts of antisocial behavior since 2006: "[H]e cussed out staff, told staff that he can do what he wants to do, elope from the unit, refused to do what he was asked to do, maybe laid in his bed nude when staff have to come by and observe him for security count after repeatedly being warned not to lay in the bed nude. In general, disrespectful and discounting of the professional staff at Coalinga State Hospital."

For those reasons, and Glenn's refusal to participate in treatment, Essres concluded Glenn still was an SVP and could not be treated in the community without posing a safety risk. Essres testified: "Mr. Glenn has never demonstrated cooperation with sex offender treatment in the past. I wouldn't expect it in the community. [He] has not demonstrated the level of diligence, discipline, responsibility, reliability that would be required to complete a quite long and involved duration of sex offender treatment. He has not demonstrated a willingness to participate in the hospital and, hence, it's unlikely in the community he will participate in sex offender treatment. His oppositionalism and statements in the hospital is that he does what he wants to do regardless of professional input and would indicate that there's little intent on cooperating in community supervision and treatment."

2. *Dr. Joyce Brown*

Dr. Joyce Brown, a psychiatrist at Coalinga State Hospital, performs evaluations of SVP's who are seeking placement in the community treatment programs. She reviewed Glenn's records but did not meet with him personally.

Brown concluded that Glenn still qualified as an SVP. She relied, in part, on Glenn's score on a Static-99R test performed by a different health care professional.

17

Glenn had a score of five, placing him in the high risk group with a reoffender rate at 25.2 percent over five years and 35.5 percent over 10 years.

Brown also considered dynamic risk factors. Because Glenn had not participated in treatment and would not talk to anybody about his offending, Brown had a limited ability to conduct a risk assessment of Glenn and evaluate the dynamic risk factors that might affect him. She viewed Glenn's pedophilia or paraphilia, which is "a life-long illness," as "the number one risk factor." Moreover, she noted that he had not been in the "community" for 10 years without reoffending and had not completed sex offender treatment. Glenn's refusal to participate in treatment was a strong indicator of his "substantial likelihood" of failing to participate in conditional outpatient treatment and reoffending "in a sexually violent predatory manner."

Brown also concluded that Glenn was not a suitable candidate for the conditional release program. She based her conclusion on two factors. First, Glenn is not amenable for treatment, as demonstrated by his refusal to participate in sex offender treatment and denial of guilt for his offenses. Second, Glenn has not shown that he can comply with authority. He engaged in disruptive conduct at the state hospital and showed a lack of respect for the staff members who treated him. Glenn had not done any of the preliminary steps to demonstrate he could benefit from and comply with the Liberty treatment program. She did not place much weight on Glenn's claim that he would follow the rules and comply with community treatment because Glenn had done nothing toward receiving treatment at the state hospital. She testified, "he's not removing his barriers to release, and those barriers are treatment of his pedophilia to the degree that he can be safe in the community."

Brown concluded: "I believe Mr. Glenn remains a risk to the community and . . . I do not believe he's appropriate for treatment in being referred to Liberty['s conditional release program] for treatment."

18

On cross-examination, Brown acknowledged that of the dozen reports of this type that she has prepared, she has never concluded that someone was suitable for conditional release if he or she had not finished the sex offender treatment program. She acknowledged placing Glenn in the high risk group solely because he had been committed to the hospital as an SVP. She was trained to automatically place all SVP's into the high risk group. She was not familiar with the SRA-FV test.

3. *Steven Arkowitz*

Steven Arkowitz is the clinical director for Liberty's conditional release program. He performs the dynamic risk assessments for subjects in that program and works closely with Coalinga State Hospital staff to transition patients into that program. His duties include reviewing hospital records, meeting with patients and staff members, and filing reports with courts addressing whether subjects are appropriate for conditional release.

Arkowitz met with Glenn to prepare a report on his suitability for conditional release. Arkowitz testified that in speaking with Glenn about community outpatient treatment, "one thing certainly that stood out is that he's not participating in treatment." Glenn had not participated at all in the inpatient phase of hospital treatment, and Glenn's denial of having committed any sex offenses, Arkowitz testified, "would make it very difficult for the treatment provider." Because sex offender treatment was required in the conditional release program, refusal to participate in treatment will result in the subject being returned to the state hospital.

Arkowitz noted too that Glenn had refused to undergo polygraph examinations, sexual thoughts and feelings polygraph examinations, sexual history disclosure polygraph examinations, and maintenance and monitoring polygraph examinations, and potentially necessary psychological, neuropsychological, and cognitive testing. Glenn had refused any phallometric or PPG assessment, in which a penile plethysmograph is used to measure sexual arousal and to assess a patient's claim

19

of suffering from impotency or erectile dysfunction.  Because Glenn had refused to undergo any of those tests, Arkowitz could not discuss additional risk factors with him.

Arkowitz also was concerned over the persistent denial by Glenn of committing sexual offenses or to acknowledge he had ever sexually touched any of his victims.  Arkowitz believed that Glenn seemed to rationalize and justify his prior arrests and convictions.  Denial of a problem was an issue because, in that case, "[t]here's not going to be anything to treat," yet treatment was a requirement of conditional release.

Arkowitz testified he usually asks patients questions about their expectations on release into the community and their social and community support network.  Glenn mentioned his two daughters, but neither they nor anyone else he knew lives in San Bernardino County.  Returning to North Carolina, which was Glenn's desire, was not an option because conditional release requires return to the county of domicile.  Arkowitz did not believe that Glenn was a good candidate for supervision due to his lack of treatment and the fact the program is set up for people who are involved in treatment.  Arkowitz believed that Glenn's history of not participating in treatment indicated Glenn would not be able to comply with the stringent requirements imposed in conditional release.

Arkowitz testified that Glenn's behavior at the state hospital presented additional risk factors.   Glenn did not comply with rules and frequently was nude.  Arkowitz believed Glenn's nudity "relates to a certain degree of sexual preoccupation [and] hypersexuality" that comes from an "underlying drive," "compulsion," or disregard for the rules.

When asked how Glenn's age factored into the risk assessment, Arkowitz testified:  "I know that . . . age is a factor in overall recidivism.  In general, as people age, their risk for reoffense goes down; however, I did also note in Mr. Glenn's case that he seems to be a pretty healthy 88 year old; that is, he ambulates well. . . . [H]e seems cognitively alert.  It seemed to me that . . . he would be able to get around

20

independently, take care of himself, those types of things. And so age is certainly a factor, and I think the Static-99R has taken age into account. So, I mean, I think we can't deny his age; however, age is only one piece of the puzzle."

On cross-examination, defense counsel asked Arkowitz whether it made sense that Glenn "might want to go out and get one last hurrah before the Grim Reaper comes" and "risk spending the rest of his short life in prison." Arkowitz responded that he had worked with "hundreds and hundreds of high risk sex offenders" and their behavior when facing third strikes might be counterintuitive or nonsensical.

## III.

### The Trial Court's Ruling

The trial court denied Glenn's petition and orally stated its reasons and findings. The court concluded Glenn did not meet his burden of proving, by a preponderance of the evidence, "he would not be a danger to the health and safety of others" and "it is unlikely he would engage in sexually violent criminal behavior due to his diagnosed mental disorder if under supervision and treatment in the community." The court expressed concern that Glenn had continually denied committing his offenses, having a mental illness, and ever touching a child in a lewd way. The court also expressed concern over Glenn's refusal to participate in sex offender treatment: "It would appear to me by the evidence that, unless Mr. Glenn's pedophiliac disorder, which is chronic and lifelong, is subject to treatment, the psychological professionals are unable to begin such treatment at the community outpatient treatment level. Mr. Glenn's disorder has not been fully vetted or even minimally analyzed in the state hospital due to his refusal of treatment. At the community outpatient treatment level, it is necessary to know his triggers and the situations he needs to avoid in order for him to be safely supervised in the community and for any kind of future prevention."

21

The trial court found that Glenn's "oppositional attitude at the hospital" revealed that Glenn had difficulty in complying with rules, which would make supervision in the community more difficult. The court considered and discounted the argument that for seven years Glenn had lived in the community without reoffending. The court stated that in that period of time Glenn "absconded from California" to North Carolina, where he ultimately was convicted for failure to register as a sex offender. The court stated, "[t]his is a period about which we know nothing of his activities simply because he was never adequately supervised by parole or by registration requirement, and it does not speak well of his ability to comply with supervision on community outpatient treatment."

The court rejected Glenn's argument that his nudism was a personal choice unrelated to sexual interest or arousal. The court stated: "[T]here's clearly a factual nexus between the fact that his commitment offenses of lewd act on a child were accompanied by misdemeanor and indecent exposure convictions . . . . I believe from the evidence that nudity was a precursor to the lewd acts on a child back in 1988."

The trial court found that the incident in 2011 when Glenn admitted being sexually aroused by a nurse taking his vital signs, his "sexual references to staff," and "this behavior" reflected "his sexual preoccupation and hypersexuality." The court stated: "I think from the evidence that [Glenn]'s nudism, coupled with the opportunity to . . . have contact with prepubescent children, which . . . since supervision is not 24/7, . . . he would have, . . . would likely result in a lewd act upon a child, which is the sexually violent predatory behavior that would be deemed likely."

The trial court acknowledged that Glenn was of advanced age, but found his Static-99R score placed him in the moderate to high category of likely to reoffend, and concurred with the People's experts that the Static-99R test accounts for age. The court found it significant that Glenn was 62 years old when he committed the qualifying offenses in 1988 and "those convictions in 1988 were but the culmination of a long

22

history of sexual criminal activity that goes back as far as 1972 for offenses involving prepubescent boys and girls occurring in 1976, 1977 and 1986, as well as allegations arising in 1989 that Mr. Glenn molested two of his grandchildren that were never adjudicated, factors in which the Static-99R places due weight in its scoring."

The court acknowledged studies showing the risk of reoffending by one who refuses treatment is no greater than the risk by one who has completed treatment. The court found, nonetheless, that "sex offender treatment is still important for the psychological health professionals to work with the sexual offender regarding putting his disease under control, and the sex offender needs to meet with them at least halfway so that they can discern a course of treatment geared to his needs and address the triggers and situations that would cause him to relapse and reoffend." Section 6608, the court noted, called for both supervision and treatment in the community, and "[t]he evidence indicates that this simply cannot be initiated at the community outpatient treatment level."

## DISCUSSION

### I.

### Due Process

A. *Facial Challenge*

Glenn argues the unconditional discharge and conditional release provisions of the SVPA, sections 6605 and 6608 in particular, are unconstitutional both on their face and as applied to him by the trial court. He argues the unconditional discharge and conditional release provisions violate due process on their face because they make conditional release a prerequisite for unconditional discharge even if the committed person can prove he no longer is an SVP. Glenn asserts, "if a person is not an SVP, he should be entitled to immediate release from custody" without having to spend at least a year in a conditional release program.

23

We rejected the same argument by Glenn in our prior opinion in *Glenn III*, *supra*, G050160.[3] The due process analysis of the unpublished decision reflects our views, and we rely on it to reject Glenn's facial constitutional challenge to the unconditional discharge and conditional release provisions of the SVPA.

Glenn also makes a more nuanced facial due process claim that we were not called upon to address in *Glenn III*. This claim is based on Arkowitz's testimony that the Liberty conditional release program will not accept anyone who has not progressed through sex offender treatment. "This means," Glenn argues, "that someone like [Glenn] who contends that he is no longer an SVP but did not achieve that status through the treatment program, will simply never be eligible to be released into the conditional release program which means that even if he is not an SVP, he is never going to be unconditionally discharged."

To succeed on a facial challenge to a legislative act, the challenger must establish that no set of circumstances exists under which the act would be valid. (*United States v. Salerno* (1987) 481 U.S. 739, 745.) "The fact [a law] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid" under a facial challenge. (*Ibid.*)

Glenn's facial challenge to the unconditional discharge and conditional release provisions of the SVPA fails. Glenn asserts only that under a particular set of circumstances, based on facts extrinsic to the SVPA, the unconditional discharge and conditional release provisions of the SVPA are unconstitutional.

B. *As-applied Challenge*

Alternatively to a facial challenge, Glenn argues the unconditional discharge and conditional release provisions of the SVPA violate due process as applied

---

[3]  Rule 8.1115(b)(2) of the California Rules of Court permits us to cite or rely on an unpublished opinion "[w]hen the opinion is relevant to a criminal . . . action because it states reasons for a decision affecting the same defendant . . . in another such action."

to him. Glenn's as-applied argument is complicated and involves a highly nuanced reading of section 6608. We will explain it step by step.

The first step in the argument is the basic constitutional premise that a person may be held in civil commitment "as long as he is both mentally ill and dangerous, but no longer." (*Foucha v. Louisiana* (1992) 504 U.S. 71, 77; accord, *McKee I*, *supra*, 47 Cal.4th at p. 1193.) A person who is mentally ill but not dangerous, or dangerous but not mentally ill, may not be held in civil commitment.

The second step of the argument is based on the requirements of section 6608. Pursuant to section 6608, subdivision (g), the trial court conducts a hearing to determine whether the committed person "would not be a danger to others due to his or her diagnosed mental disorder while under supervision and treatment in the community." Section 6608, subdivision (g) requires that a "substantial portion" of the conditional release program include "outpatient supervision and treatment." Glenn argues those provisions are ambiguous because they could be interpreted as requiring supervision *or* treatment or could be interpreted as requiring supervision *and* treatment. He posits that, if a committed person would not be dangerous while under supervision, then, under *Foucha v. Louisiana*, *supra*, 504 U.S. 71, the person must be released regardless of whether the committed person has undergone or will undergo treatment.

Next, section 6608, subdivision (h) provides that before the committed person is placed in a conditional release program, the community program director must make a recommendation stating "*which* forensic conditional release program is most appropriate for supervising and treating the committed person." (Italics added.) This suggests, Glenn argues, that the Legislature "envisioned" many conditional release programs. Liberty provides only one program, and it requires participation in treatment. But if the committed person would not be dangerous while under supervision in a conditional release program without treatment, then requiring treatment—or denying conditional release based on refusal to participate in treatment—violates the committed

25

person's constitutional rights. The constitutional premise is that a person may be held in civil commitment only so long as that person is mentally ill *and* dangerous. If the committed person is no longer dangerous, he or she cannot be denied release based on the need to treat the mental illness.

The problem with section 6608, according to Glenn, is "[t]he statute simply does not tell us whether a person who could be safely supervised in the community but who is unwilling to participate in treatment [is] eligible for conditional release." Glenn contends the trial court interpreted section 6608, and applied it to him, as to require both supervision and treatment in the community and that treatment cannot be initiated in conditional release. Because he has refused treatment, he is ineligible, under the trial court's interpretation of section 6608, for conditional release even though he would not pose a danger while under supervision in the community. Conditional release is a prerequisite to unconditional discharge (§ 6608, subds. (a), (g), (m)); therefore, according to Glenn, his refusal to participate in treatment means he must spend the rest of his life in confinement, even though, at age 90 with limited mobility and no signs of sexual desires, he poses virtually no danger of committing another sexual offense with or without supervision.

The premise of Glenn's as-applied challenge is that the trial court denied the petition for conditional release based primarily, if not solely, on Glenn's refusal to participate in sex offender treatment. Evidence the committed person refuses to participate in sex offender treatment, while relevant to determining whether he or she "continues to pose a danger and is therefore not eligible for unconditional discharge," is not dispositive of the issue. (*People v. LaBlanc*, *supra*, 238 Cal.App.4th at p. 1078.)

The reasons orally given by the trial court show it considered and placed weight on Glenn's refusal to participate in treatment. But the trial court did not base its decision entirely on that factor or treat it as dispositive. The trial court also considered expert testimony placing Glenn in the moderate to high category of risk of reoffending,

26

his denial of being mentally ill and of ever having committed a sex offense, the chronic and lifelong nature of pedophilia, his nudism and other behavior indicating "hypersexuality," and the fact he had committed qualifying offenses at age 62. It was the totality of those factors, including Glenn's refusal to participate in sex offender treatment, that led the trial court to conclude Glenn had not met his burden of proving it was likely he would not engage in sexually violent criminal behavior due to his diagnosed mental disorder if under supervision and treatment in the community.

Glenn trenchantly criticizes the trial court's reasons and findings. Some of Glenn's criticisms are valid, for example, the trial court found that Glenn had "absconded" to North Carolina, which was not the case. While the trial court's comments on the record provide insight into the basis for the decision, we presume the judgment is correct, and review the result, not the reasoning, for error. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133; *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.) Neither party requested a statement of decision; therefore, we must assume the trial court made whatever findings were necessary to support the order denying Glenn's petition. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.)

## II.

### County of Domicile

Glenn argues his petition was tried and decided by the trial court under the "false pretense[]" that San Bernardino County was his county of domicile. Glenn's county of domicile argument is also complicated and highly nuanced, so we will take it step by step.

When the trial court denied Glenn's petition, section 6608.5 provided that "[a] person who is conditionally released pursuant to this article shall be placed in the county of the domicile of the person prior to the person's incarceration" unless the trial

27

court found that "extraordinary circumstances" required placement elsewhere. (§ 6608.5, former subd. (a); Historical and Statutory Notes, 73E West's Ann. Welf. & Inst. Code (2016 supp.) foll. § 6680.5, p. 88.) Glenn's county of domicile was in North Carolina, where Glenn was living when he was taken into custody for indecent exposure. The State of California's lack of authority to place Glenn in a conditional release program in North Carolina constitutes extraordinary circumstances requiring his placement outside of San Bernardino County. Evidence was presented that Glenn has a daughter living in Tehama County, she is supportive of him, and the presence of support in Tehama County meant Glenn more likely would succeed in an outpatient program there. The trial court did not consider placing Glenn in a conditional release program in Tehama County and assumed (as did all counsel) that San Bernardino County was his county of domicile.

The matter of domicile was not raised at the hearing on Glenn's petition. For that reason, the Attorney General argues Glenn has forfeited the issue. We consider the issue to avert an ineffective assistance of counsel claim by habeas corpus petition. (*People v. Hardy* (1992) 2 Cal.4th 86, 209.)

Under both the former and current versions of section 6608.5, county of domicile means "the county where the person has his or her true, fixed, and permanent home and principal residence and to which he or she has manifested the intention of returning whenever he or she is absent." (§ 6608.5, subd. (b)(1).)[4] If a county of

_____

[4] The full text of section 6608.5, subdivision (b)(1) is: "For the purposes of this section, 'county of domicile' means the county where the person has his or her true, fixed, and permanent home and principal residence and to which he or she has manifested the intention of returning whenever he or she is absent. For the purposes of determining the county of domicile, the court may consider information found on a California driver's license, California identification card, recent rent or utility receipt, printed personalized checks or other recent banking documents showing that person's name and address, or information contained in an arrest record, probation officer's report, trial transcript, or other court document. If no information can be identified or verified, the county of domicile of the individual shall be considered to be the county in which the person was

domicile cannot be determined from certain sources of information, the county of domicile is deemed to be "the county in which the person was arrested for the crime for which he or she was last incarcerated in the state prison or from which he or she was last returned from parole." (*Ibid.*) Extraordinary circumstances means "circumstances that would inordinately limit the department's ability to effect conditional release of the person in the county of domicile in accordance with Section 6608 or any other provision of this article, and the procedures described in Sections 1605 to 1610, inclusive, of the Penal Code." (§ 6608, subd. (c).)

No evidence, such as a California driver's license, was presented to identify a county of domicile within California for Glenn. He testified he was living at his home in North Carolina when arrested for indecent exposure in 2002. He was extradited to California, where he was charged in San Bernardino County with failure to register as a sex offender.

Under the versions of section 6608 and section 6608.5 in effect at the time of the hearing, it is unclear whether the county of domicile would have been San Bernardino County or in North Carolina. Before Glenn began his incarceration in 2003, his "true, fixed, and permanent home and principal residence" was in North Carolina. (§ 6608.5, subd. (b)(1).) But no evidence of the type listed in the second sentence of section 6608.5, subdivision (b)(1) was presented to identify or verify Glenn's county of domicile, which would make San Bernardino County his domicile because that was the last county in California in which he was arrested.[5]

---

arrested for the crime for which he or she was last incarcerated in the state prison or from which he or she was last returned from parole."

[5] Section 6608 was amended effective January 1, 2015 (after the trial court's decision) to establish a procedure for determining county of domicile when one or more counties, outside the county of commitment, may be the county of domicile. (See Historical and Statutory Notes, 73E West's Ann. Welf. & Inst. Code, *supra*, foll. § 6608, pp. 81-83.)

Assuming Glenn's county of domicile was in North Carolina, any error in treating San Bernardino County as the county of domicile was harmless. The trial court did not consider absence of community support in San Bernardino County as a factor in the decision to deny Glenn's petition for conditional release, and Glenn is incorrect to assert otherwise. The only evidence supporting placement in Tehama County was Glenn's very brief testimony that his daughter is his "best friend" and "behind me tooth and nail." Under the standard of *People v. Watson* (1956) 46 Cal.2d 818, there was no reasonable probability Glenn would have achieved a more favorable result if the trial court had recognized that San Bernardino County was not his county of domicile.

## III.

## Equal Protection

A. *Glenn's Equal Protection Argument*

Glenn argues he suffered an equal protection violation because section 6608, subdivision (k) (section 6608(k)) placed on him, as the SVP, the burden of proving by a preponderance of the evidence that he was suitable for conditional release. Glenn's equal protection argument is complicated and, like his as-applied due process and county of domicile arguments, requires step-by-step explanation.

Glenn argues that as an SVP he is similarly situated to mentally disordered offenders (MDO's) for equal protection purposes. For an MDO to obtain placement in an outpatient program, Penal Code section 2972, subdivision (d) requires the MDO to establish reasonable cause to believe he or she could be safely and effectively treated in an outpatient treatment program. In contrast, for an SVP to obtain conditional release, section 6608(k) requires the SVP to prove by a preponderance of the evidence that he or she would not be dangerous if under supervision and treatment in the community. These different burdens of proof—reasonable cause versus preponderance of the evidence— constitute disparate treatment of MDO's and SVP's. Glenn argues that under the strict

30

scrutiny test, the State of California has not shown and cannot show such disparate treatment is necessary to serve a compelling governmental interest. For the reasons we shall explain, although SVP's and MDO's are similarly situated for equal protection purposes, the disparity in treatment passes the strict scrutiny test.[6]

The Attorney General argues Glenn forfeited his equal protection claim by not raising it in the trial court and not requesting an individual evidentiary hearing. We consider the issue because it can be decided as a matter of law and to avert an ineffective assistance of counsel claim by habeas corpus petition. (*People v. Hardy*, *supra*, 2 Cal.4th at p. 209.)

B. *Equal Protection Requirements*

Glenn's right to equal protection of the laws arises out of the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution. The equal protection guarantees of the Fourteenth Amendment and California Constitution are substantially the same and are analyzed in a similar manner. (*People v. Noyan* (2014) 232 Cal.App.4th 657, 666.) "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally." (*People v. Brown* (2012) 54 Cal.4th 314, 328.) Both the United States Supreme Court and the California Supreme Court have applied the equal protection clause to civil commitment statutes "to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens." (*McKee I*, *supra*, 47 Cal.4th at p. 1199.)

The first requirement of a meritorious equal protection claim is a showing that the state has adopted a classification that affects two or more similarly situated

---

[6] In *Glenn III*, *supra*, G050160, we rejected a different equal protection challenge. In that case, Glenn argued SVP's and MDO's receive disparate treatment because an SVP, unlike an MDO, must petition for conditional release for a one-year period before being able to petition for unconditional discharge.

groups in an unequal manner. (*People v. Brown*, *supra*, 54 Cal.4th at p. 328.) Groups need not be similarly situated for all purposes but only for the purposes of the law challenged. (*Ibid.*)

If the state's classification affects two or more similarly situated persons unequally for purposes of the law challenged, then the state must provide a justification for the disparate treatment. (*People v. Noyan*, *supra*, 232 Cal.App.4th at p. 666.) Most distinctions in legislation are tested to determine if the challenged classification bears a rational relationship to a legitimate state purpose. (*In re Smith* (2008) 42 Cal.4th 1251, 1262-1263.) Distinctions involving suspect classifications or touching upon fundamental interests are subject to strict scrutiny, and can be upheld only if necessary to achieve a compelling state interest. (*Ibid.*) Classifications based on gender are subject to an intermediate level of review. (*Id.* at p. 1263.) Strict scrutiny is the standard for measuring claims of unequal treatment in cases of involuntary civil commitment. (*Ibid.*)

C. *Similarly Situated Requirement*

The first step in the equal protection analysis is to determine whether SVP's and MDO's are similarly situated for purposes of the law challenged. The law challenged by Glenn is the burden of proof imposed on an SVP to obtain conditional release (§ 6608(k)) and the burden of proof imposed on an MDO to obtain release on outpatient status (Pen. Code, § 2972, subd. (d)).[7]

---

[7] Section 6608(k) states: "In a hearing authorized by this section, the committed person shall have the burden of proof by a preponderance of the evidence, unless the report required by Section 6604.9 determines that conditional release to a less restrictive alternative is in the best interest of the person and that conditions can be imposed that would adequately protect the community, in which case the burden of proof shall be on the state to show, by a preponderance of the evidence, that conditional release is not appropriate."

Penal Code section 2972, subdivision (d) states in relevant part: "A person shall be released on outpatient status if the committing court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient

In *McKee I*, *supra*, 47 Cal.4th at pages 1203, 1207, the California Supreme Court concluded SVP's and MDO's (along with those committed after being found not guilty by reason of insanity (NGI's)) are similarly situated for purposes of an equal protection challenge. Glenn and the Attorney General disagree over the purposes for which the Supreme Court concluded SVP's and MDO's are similarly situated. The Attorney General argues that SVP's and MDO's are similarly situated under *McKee I* only for the limited issue of the constitutionality of the indeterminate term of commitment for SVP's. Glenn argues SVP's and MDO's also are similarly situated under *McKee I*, not only for term of commitment, but also for the burden of proof necessary to place someone in civil commitment and to obtain release from civil commitment.

The defendant in *McKee I* was found to be an SVP and involuntarily committed for the prescribed indeterminate term. (*McKee I*, *supra*, 47 Cal.4th at pp. 1184-1185.) He contended his involuntary commitment as an SVP for an indeterminate term violated equal protection because SVP's are treated less favorably than those similarly situated MDO's. (*Id.* at p. 1202.) The California Supreme Court, after describing the respective treatment afforded SVP's and MDO's, stated: "In summary, SVP's under the [SVPA] are given indeterminate commitments and thereafter have the burden to prove they should be released (unless the DMH [(State Department of Mental Health)] authorizes a petition for release). In contrast, an MDO is committed for a one-year period and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year. There is therefore no question that, after the initial commitment, an SVP is afforded different and less favorable procedural protections than an MDO." (*Id.* at p. 1202.)

---

basis. . . . The standard for revocation under Section 1609 shall be that the person cannot be safely and effectively treated on an outpatient basis."

33

The *McKee I* court concluded that SVP's and MDO's are similarly situated "for our present purposes" because (1) both had been found beyond a reasonable doubt to suffer from mental disorders rendering them dangerous to others and (2) the SVPA and the Mentally Disordered Offender Act (Pen. Code, § 2960 et seq.) had the same purpose of protecting the public from dangerous felony offenders with mental disorders and providing treatment for those disorders. (*McKee I*, *supra*, 47 Cal.4th at p. 1203.)

The state therefore was required to provide justification for treating MDO's and SVP's differently: "In other terms, imposing on one group an indefinite commitment and the burden of proving they should not be committed, when the other group is subject to short-term commitment renewable only if the People prove periodically that continuing commitment is justified beyond a reasonable doubt, raises a substantial equal protection question that calls for some justification by the People. . . . [S]tandards and burdens of proof represent societal determinations of who should bear the risk that a court's or jury's judgment will be in error. [Citation.] Standards and burdens of proof, like other due process protections afforded both criminal defendants and persons subject to involuntary commitment, also balance the individual's fundamental liberty interest in not being incarcerated or involuntarily confined with the state's compelling interest in protecting society from dangerous persons, in punishing criminal behavior in the case of criminal defendants, and in treating mental illness in the case of civil committees. Because MDO's and SVP's have the same interest at stake—the loss of liberty through involuntary civil commitment—it must be the case that when society varies the standard and burden of proof for SVP's . . . , it does so because of the belief that the risks involved with erroneously freeing SVP's from their commitment are significantly greater than the risks involved with freeing MDO's." (*McKee I*, *supra*, 47 Cal.4th at pp. 1203-1204.)

The California Supreme Court remanded the matter to the trial court to determine "whether the People, applying the equal protection principles . . . discussed in the present opinion, can demonstrate the constitutional justification for imposing on

34

SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*McKee I*, *supra*, 47 Cal.4th at pp. 1208-1209.)

The purposes for which SVP's were held to be similarly situated in *McKee I*, and the purposes for which Glenn contends they are similarly situated in this case, are flip sides of the same coin. The reasons given in *McKee I* for concluding that SVP's and MDO's are similarly situated apply with equal force when considering the burden of proof for obtaining conditional release. Because SVP's and MDO's are similarly situated for purposes of length of commitment and placement of the burden of proof to obtain release from commitment, they are similarly situated for purposes of burden of proof for conditional release or release for outpatient treatment.

D. *Strict Scrutiny Test*

SVP's and MDO's are treated differently for purposes of obtaining release from confinement. To obtain conditional release, the SVP has the burden of proving, by a preponderance of the evidence, it is not likely he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community. (§ 6608, subd. (g); § 6608(k).) To obtain release on outpatient status, an MDO has the lower burden of showing "reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis." (Pen. Code, § 2972, subd. (d).)

Thus, to overcome an equal protection challenge, section 6608, subdivision (g) and section 6608(k) must pass strict scrutiny review. (*In re Smith*, *supra*, 42 Cal.4th at p. 1263.) In *In re Moye* (1978) 22 Cal.3d 457, 465, a case involving an equal protection challenge to a civil commitment statute, the California Supreme Court articulated the strict scrutiny standard as: "[T]he state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest."

In applying the strict scrutiny test, we start by returning to *McKee I*, *supra*, 47 Cal.4th 1172. In remanding the case, the Supreme Court in *McKee I* emphasized two points. First, different classes of persons civilly committed need not be treated identically, and the government should have the opportunity to demonstrate the SVPA's indeterminate commitment provisions "are based on a *reasonable perception* of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate." (*McKee I*, *supra*, at p. 1210, italics added.) Second, the appropriate determination for the trial court is "whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not whether they are incontrovertible or uncontroversial." (*Id.* at pp. 1210-1211.)

On remand from *McKee I*, the trial court conducted a 21-day evidentiary hearing at which the People presented testimony from eight witnesses and documentary evidence, and Richard McKee presented testimony from 11 witnesses and documentary evidence. (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1330, 1332 (*McKee II*).) The trial court issued a 35-page statement of decision summarizing the testimony and documentary evidence presented at the hearing. (*Id.* at p. 1332.) The trial court found, "the People had met their burden to establish, by a preponderance of the evidence, that the disparate treatment of SVP's under the [SVPA] was based on a reasonable perception of the greater and unique dangers they pose compared to MDO's and NGI's." (*Ibid.*) The court confirmed its prior commitment order. (*Ibid.*)

Division One of the Fourth Appellate District applied a de novo standard of review to "independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the [SVPA]." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.) The Court of Appeal concluded the People met their burden on remand to present substantial evidence justifying disparate treatment of SVP's by imposing indeterminate terms of civil

36

commitment and placing on them the burden to prove they should be released. (*Id*. at p. 1347.)  The evidence showed that "'notwithstanding the similarities between SVP's and MDO's . . . , the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society.'"  (*Ibid.*)  Disparate treatment of SVP's was justified by evidence showing (1) "'the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely'"; (2) "'SVP's pose a greater risk [and unique dangers] to a particularly vulnerable class of victims, such as children'"; and (3) "SVP's have diagnostic and treatment differences from MDO's and NGI's."  (*Ibid.*)  Such differences supported a "reasonable perception by the electorate" that disparate treatment of SVP's was "necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered.  [Citation.]"  (*Ibid.*)

The California Supreme Court denied review of *McKee II*.  In *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1377-1378, a panel of this court agreed with *McKee II* and concluded, "*McKee I* plainly expressed the Supreme Court's desire to resolve on a classwide basis the equal protection challenge of all SVP's to indeterminate commitments under the Amended SVPA."

The reasons given by *McKee II* to justify disparate treatment for SVP's also justify treating SVP's differently from MDO's for purposes of obtaining release from confinement.  A higher recidivism rate, greater risk to a vulnerable class, and diagnostic and treatment differences from MDO's support a "reasonable perception by [the Legislature]" that imposing on SVP's a higher burden of proof to obtain conditional release than is placed on MDO's to obtain outpatient status is "necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered."  (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)

37

# IV.

## Sufficiency of the Evidence

Glenn argues the evidence was insufficient to support a finding that he would be a danger to others due to his diagnosed mental disorder while under supervision in the Liberty conditional release program. He does not dispute that the record contains sufficient evidence to support a finding that he will not participate in treatment as part of conditional release. His argument is that "the evidence that he is dangerous was completely inadequate." Glenn's age and health are at the core of his challenge to the sufficiency of the evidence. He argues his age and health make the state's evidence "fundamentally ridiculous" because "the idea that a person of [his] age, with health problems that include limited mobility, could not be safely supervised by . . . California's most intensive supervision program is unreasonable."

The Court of Appeal reviews the sufficiency of the evidence in SVP cases under the same substantial evidence test used in criminal appeals. (*People v. McCloud* (2013) 213 Cal.App.4th 1076, 1088.) "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Reversal for insufficiency of the evidence is warranted only if it appears that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*Ibid.*)

The standard for conditional release is "whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community." (§ 6608, subd. (g).) As we explained in detail in part II.C. of the Facts and Procedural History section, the People presented testimony from Essres and Brown that Glenn, despite his age, would pose a

38

danger to others if placed under supervision in a conditional release program. Arkowitz expressed concern over Glenn's refusal to undergo any kind of testing and Glenn's ability to comply with the rules of supervision.

The testimony of Essres, Brown, and Arkowitz provided sufficient evidence that Glenn remains an SVP and would be a danger to others due to his diagnosed mental disorder while under supervision in the Liberty conditional release program. Essres, Brown, and Arkowitz considered Glenn's refusal to participate in treatment at the state hospital as an indication Glenn would not participate in treatment while on conditional release. Essres, Brown, and Arkowitz also considered Glenn's refusal to participate in treatment as indicating he would not comply with the terms of supervision while on conditional release and therefore would be a danger to others.

Glenn places emphasis on two aspects of the substantial evidence rule. First, substantial evidence review is not limited to evidence favorable to the respondent; instead, "'[the Court of Appeal] must resolve the issue in the light of the *whole* record— i.e., the entire picture of the defendant put before the jury—and may not limit [its] appraisal to isolated bits of evidence selected by the respondent.'" (*People v. Johnson* (1980) 26 Cal.3d 557, 577.) The whole record in this case does show that Glenn was 88 years old at the time of the hearing (he is 90 now), uses a walker, had lived in the community from 1995 through 2002 without any evidence of having committed a sexually violent offense, had undergone chemotherapy for colon cancer and radiation therapy for prostate cancer, denied the ability to maintain an erection, and denied having sexual urges. Schwartz and North testified that Glenn did not pose a risk of committing sex offenses while under supervision in a conditional release program. Caudle explained the stringent level of supervision (including around-the-clock GPS monitoring) imposed by Liberty's conditional release program.

We cannot overlook this evidence or deny its weight. The substantial evidence rule is, however, highly deferential. (E.g., *People v. Lindberg* (2008) 45 Cal.4th

39

1, 37.)  In applying the substantial evidence rule, the reviewing court does not ask itself whether it would have reached the same conclusion as the trier of fact, but whether a rational trier could have reached the decision it did.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Johnson*, *supra*, 26 Cal.3d at p. 576.)  The record in this case, when viewed in its entirety and in the light most favorable to the judgment, shows evidence from which a rational trier of fact could find that Glenn would be a danger to others due to his diagnosed mental disorder while under supervision in the Liberty conditional release program.

The second aspect of the substantial evidence rule emphasized by Glenn is that the evidence must be "reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578), or the evidence, in light of the entire record, "is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined" (*People v. Conner* (1983) 34 Cal.3d 141, 149).  Glenn argues the testimony of Essres and Brown did not meet that standard.  Glenn argues Essres's use of the SRA-FV test was unreliable because Essres failed to give him credit for being in the community seven years without reoffending and Brown's use of the Static-99R test was unreliable because Brown was not an experienced evaluator, had never found anyone to qualify for conditional release who had not completed treatment, and relied on calculations derived by others rather than doing her own work.  Both Essres and Brown lacked credibility, Glenn argues, because they exaggerated the significance of his behavior at the state hospital and did not reduce his risk of reoffense for his advanced age.

Again, we acknowledge what appear to be some weaknesses in the testimony of Essres and Brown.  But we do not reassess or reweigh witness credibility.  (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 37; *People v. Sumahit* (2005) 128 Cal.App.4th 347, 352 [SVP determination].)  We may reject witness testimony that is

40

inherently incredible; that is, when it is physically impossible for the testimony to be true or the falsity in the testimony is apparent without resorting to inferences or deduction. (*People v. Thompson* (2010) 49 Cal.4th 79, 124; *People v. Barnes* (1986) 42 Cal.3d 284, 306.)  The testimony of Essres and Brown is not inherently incredible such that we may reject it.  Based on the record, a reasonable trier of fact could find that an 88-year-old man may pose a danger to others due to his diagnosed mental disorder while under supervision in a conditional release program.

## DISPOSITION

The order denying Glenn's petition for unconditional discharge and in the alternative for conditional release is affirmed.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

41